PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MASON H. BRUMBACH, | ) | |
| ADMINISTRATOR OF THE ESTATE OF | ) | CASE NO.  4:24-CV-285 |
| FRED HENRY WILD, DEC., | ) | |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | |
| | ) | **MEMORANDUM OF OPINION AND** |
| OFFICER SHANE SMITH, *et al.*, | ) | **ORDER** |
| | ) | [Resolving ECF Nos. 69, 70, 73, and 74] |
| Defendants. | ) | |
| | ) | |

Pending before the Court are four Motions for Summary Judgment submitted by Defendants Jason Bonar (ECF No. 69), Dennis Garito (ECF No. 70), Jarett Pishotti and Shane Smith (ECF No. 73), and Cody Dean (ECF No. 74).  Plaintiff opposes each motion in a single opposition brief.  ECF No. 76.  Defendants independently replied in support of their respective motions.  Dean Reply Br., ECF No. 79; Smith and Pishotti Reply Br., ECF No. 80; Bonar Reply Br., ECF No. 81; Garito Reply Br., ECF No. 82.  Within the reply briefs, Defendants each move to strike Daniel Lane's affidavit included in Plaintiff's opposition brief.  The Court construes Plaintiff's sur-reply (ECF No. 83) as an opposition to the motions to strike.  *See* ECF No. 84.

Having reviewed the parties' briefs, applicable law, and the record, Defendants Bonar (ECF No. 69), Garito(ECF No. 70), and Dean's (ECF No. 74) motions for summary judgment are granted for the reasons set forth herein.  Defendant Pishotti and Smith's joint motion for summary judgment (ECF No. 73) is granted in part.   That motion is granted as to Defendant

(4:24CV285)

Pishotti and denied as to Defendant Smith.  Defendants' arguments to strike the affidavit of Daniel Lane are well-taken.  Mr. Lane's affidavit and all attachments thereto are stricken.

## I.      FACTUAL BACKGROUND[1]

This case concerns the death of Fred Henry Wild, III, who was shot and killed by police during, what his friends and family identified as, a mental health crisis.  Plaintiff, Mason H. Brumbach, Wild's son, asserts the following claims against each Defendant: (1) a civil rights claim under 42 U.S.C. § 1983; and (2) a wrongful death claim under Ohio Rev. Code § 2125.01. ECF No. 1-1.  The pertinent events leading to Wild's death are as follows.

### A.  Stipulated Facts[2]

The parties stipulate to the following facts:

1.  The shooting of Fred Wild occurred on March 21, 2023.

2.  Mr. Wild was reported on the premises of the property located at 1433 State Route 7 NE, Brookfield, Trumbull County, Ohio.

3.  At the time of the shooting, Mr. Wild had multiple warrants out for his arrest and was reported to be in a small hunting cabin.

4.  Brian Adkins, the owner of the cabin and Mr. Wild's longtime friend, gave police consent to enter the property to apprehend Mr. Wild.

5.  On March 18, 2023, Liberty Township Police Department was involved in a pursuit with Mr. Wild.

6.  During the March 18, 2023 pursuit, officers lost sight of Mr. Wild and the pursuit ended.

7.  On March 20, 2023, Lordstown Police were in pursuit with Mr. Wild.  The pursuit covered approximately 38 miles.

8.  Lordstown Police lost sight of Mr. Wild as he drove alongside a set of railroad tracks.

---

[1] As it must on summary judgment, the Court construes these facts in the light most favorable to Plaintiff.  *See Scott v. Harris*, 550 U.S. 372, 378 (2007).

[2] *See* ECF No. 66.

(4:24CV285)

9. Mr. Wild fled on foot and was not immediately located.

10. On March 20, 2023, at approximately 9:20 p.m., Brookfield Township Police Department received a call reporting a motor vehicle theft.

11. The owner of the vehicle, Mr. Shafer, reported the vehicle theft and informed the officer that the vehicle was stolen between the hours of 5:30 p.m. and 9:00 p.m.

12. The officer received a detailed description of the vehicle and learned that it was a pick-up truck with a yellow Myers snowplow attached to the front.

13. Mr. Wild went to Mr. Adkin's property and went to one of the cabins on Mr. Adkin's property.

14. Mr. Adkins made verbal contact with Mr. Wild and told him he was out of control and needed help.

15. Mr. Wild told Mr. Adkins that he did not want to go to jail.

16. Mr. Adkins told Mr. Wild that he needed to go to the hospital.

17. Mr. Adkins told Mr. Wild that the police knew where he was or would find out soon.

18. Mr. Adkins told Mr. Wild "they're going to shoot you"[,] referring to the police finding Mr. Wild.

19. A coalition of officers from various jurisdictions (collectively, "Law Enforcement Coalition" or "LEC") was put together to approach the hunting cabin where Mr. Wild was hiding.

20. Ten officers met and discussed a plan to arrest Mr. Wild.

21. Nine officers went down a dirt road that led to the cabin where Mr. Wild was reportedly hiding.

22. One officer remained at the driver's entrance on State Route 7.

23. As the officers approached the cabin where Mr. Wild was reported to be staying, music was heard.

24. The officers made visual contact and confirmed that Mr. Wild was in the cabin.

25. The pick-up truck Mr. Wild had stolen was parked next to the cabin.

26. As the officers approached, Mr. Wild became aware of their presence.

27. Mr. Wild jumped out of the cabin window, directly into the stolen pick-up truck.

(4:24CV285)

28. Mr. Wild was in the driver's seat of the pick-up truck, and officers including Deputy Garito, attempted to break the passenger side window of the pick-up.

29. Additional officers approached the cabin from the wooded area.

**B.  Wild's Pre-Shooting Behavior.**

On or about March 17, 2023, Plaintiff contacted police about Wild's erratic behavior. Brumbach dep. Tr., ECF No. 75-1 at PageID #: 1733, 18:5–19:3.  He testified that he wanted Wild to stop running, so he notified police of Wild's whereabouts in connection with a Lake County arrest warrant for felony vandalism and an OVI.  ECF No. 75-1 at PageID #: 1735, 27:12–24; Moran Aff. Ex. A-13, ECF No. 69-1 at PageID # 711.  The next day, the Liberty Township Police Department received an emergency call from Wild's daughter stating that he was at her residence and that "she was frightened by [Wild's] comments and actions." Brookfield OIS Report, ECF No. 70-2 at PageID ##: 1539–40.  When officers attempted to apprehend him, Wild led them on a high-speed chase and evaded capture.  ECF No. 66 at PageID #: 531, ¶¶ 5–6.  Officers filed charges against Wild through Girard Municipal Court for failure to comply with an order or signal of a police officer.  ECF No. 70-2 at PageID #: 1540.

On March 20, 2023, Wild's former employer, Ian Proverbs, contacted the Lordstown Police Department, reported that Wild was unlawfully on his property, and asked that he be removed.  Mr. Proverbs also told Lordstown police about Wild's police chase two days earlier. Moran Aff. Ex. A-13, ECF No. 69-1 at PageID #: 1335.  As officers approached Wild's vehicle, he fled, leading police on a second high-speed chase for approximately 38 miles and reaching speeds of 110 miles per hour.  ECF No. 66 at PageID #: 532, ¶ 7.  Police lost sight of Wild along some railroad tracks, where he abandoned his vehicle and continued fleeing on foot.  ECF No. 66 at PageID #: 532, ¶¶ 8–9.  Officers from the Trumbull County Sheriff's Office, the Ohio State Highway Patrol, the Vienna Township Police Department, and Brookfield Township Police

4

(4:24CV285)

Departments unsuccessfully attempted to find Wild.  Moran Aff. Ex. A-13, ECF No. 69-1 at PageID ##: 1338–39.

After evading police and abandoning his vehicle, Wild stole a blue Chevrolet pickup truck with a yellow snowplow attached to the front bumper.  ECF No. 66 at PageID #: 532, ¶ 12. The vehicle's owner reported the theft to the Brookfield Township Police department at approximately 9:20 p.m. on March 20, 2023.  ECF No. 66 at PageID #: 532, ¶¶ 10–11.  Later that evening, at approximately 11:52 p.m., Brian Adkins, Wild's longtime friend, notified Defendant Cody Dean (a Brookfield Police sergeant) that Wild was hiding in a cabin on Adkins' property at 1433 State Route 7 NE, Brookfield, Ohio 44403.  Moran Aff. Ex. A-5 (Dean BWC 1), ECF No. 69-1 at PageID #: 684; Faulkner Expert Report, ECF No. 69-5 at PageID #: 1427.[3] Mr. Adkins told Sgt. Dean that there were crossbows and ammunition in the cabin, but that Wild did not have any guns with him.  Moran Aff. Ex. A-5 (Dean BWC 1), ECF No. 69-1 at PageID #: 684 [timestamp: 23:55:53–59].[4]  Conversely, Defendant Dennis Garito, Jr. (a Trumbull County Sheriff's Deputy) averred that when he began his shift, another officer reported that Wild might be in possession of a "muzzle loader."[5]  Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #:

---

[3] Officers Smith and Pishotti noticed Samuel Faulkner as an expert defense witness. ECF No. 50.  Mr. Faulkner's expert report was also referenced and submitted by Defendants Bonar (ECF No. 69-5) and Garito (ECF No. 70-6).  For ease of reference, the Court will refer only to ECF No. 69-5 when discussing Mr. Faulkner's report.

[4] The Court notes that the timestamps for the body camera recording devices were not set to a consistent time, with some recordings being off be a few minutes and even an hour.  Despite the inconsistent timestamps, the parties do not dispute that the videos depict the same events and, therefore, the Court shall reference the timestamps shown on each respective video.

[5] Officer Smith explained that a "muzzle loader" is a firearm that is loaded by pushing a projectile, followed by gun powder, down the gun's muzzle.  Such firearms are typically used for hunting.  Smith dep. Tr., ECF No. 67-1 at PageID #: 543, 5:5–14.

(4:24CV285)

744; Smith dep. Tr., ECF No. 67-1 at PageID #: 542, 4:8–25. No firearms, including a muzzle loader, were found in Wild's possession after the shooting.

**C. Law Enforcement Coalition's Attempts to Arrest Wild.**

After confirming that Wild was hiding in Mr. Adkin's hunting cabin, Sgt. Dean requested assistance from other law enforcement agencies to apprehend him. ECF No. 66 at PageID #: 532, ¶¶ 19–20. The law enforcement coalition ("LEC") was comprised of: the Ohio State Highway Patrol (Sgt. Jason Bonar, Lt. Timothy Grimm, Trooper Scott Boyle, and Trooper Kevin Brown); the Vienna Township Police Department (Officer Jarett Pishotti and Officer Shane Smith); the Trumbull County Sheriff's Office (Deputy Dennis Garito); the Brookfield Township Police Department (Officer Joshua Ellwood-Bellas and Sgt. Cody Dean); and the Lordstown Police Department (Officer Ted Drewek). ECF No. 66 at PageID #: 532, ¶ 20; Bonar Aff., ECF No. 69-2 at PageID #: 1412, ¶ 12. The LEC planned for Trooper Brown to remain near the street while the other officers approached on foot and surrounded the cabin. Once the cabin was surrounded, the LEC planned for Trooper Brown to drive towards the cabin and use his PA system to order Wild to surrender. Bonar dep. Tr., ECF No. 64-1 at PageID ##: 386–87, 5:7–6:9; ECF No. 69-5 at PageID #: 1427. Before approaching the cabin, Sgt. Dean briefed the LEC on Wild's two high-speed chases and two outstanding arrest warrants. Faulkner Expert Report, ECF No. 69-5 at PageID ##: 1431, 1438; Smith Aff., ECF No. 73-1 at PageID #: 1694, ¶¶ 5–6; Pishotti Aff., ECF No. 73-2 at PageID #: 1698, ¶¶ 5–6.

**D. The Shooting and Subsequent Investigation.**

The LEC approached the cabin along a long driveway and positioned themselves in various vantage points around the structure. Bonar dep. Ex. 1, ECF No. 64-1 at PageID #: 431; Faulkner Expert Report, ECF No. 69-5 at PageID ##: 1434–35, 1439; Smith Aff., ECF No. 73-1

(4:24CV285)

at PageID #: 1694, ¶ 8; Pishotti Aff., ECF No. 73-2 at PageID #: 1698, ¶ 8.  The stolen pickup truck was parked along the south side of the cabin, blocking the cabin doorway but leaving the driver's side of the pickup accessible from a cabin window.  Bonar dep. Ex. 1, ECF No. 64-1 at PageID ##: 430–31; Faulkner Expert Report, ECF No. 69-5 at PageID #: 1427.  Defendants Dean, Pishotti, and Garito approached from the south, facing the pickup's passenger-side door.  Bonar dep. Ex. 1, ECF No. 64-1 at PageID #: 431; Pishotti dep. Tr., ECF No. 67-2 at PageID #: 596, 4:5–9.  Officer Drewek was behind the truck while Defendants Bonar and Smith approached the cabin from the north with Officer Ellwood-Bellas, Lt. Grimm, and Trooper Boyle.  Smith dep. Tr., ECF No. 67-1 at PageID #: 542, 4:3–7.

As they drew closer, Wild became aware of the officers' presence, prompting them to turn on their lights and issue loud commands for Wild to surrender with his hands up.  Pishotti dep. Ex. 2, ECF No. 67-2 at PageID #: 619; Boyle Aff., ECF No. 69-4 at PageID #: 1422, ¶ 16.  Rather than comply, Wild jumped out of the cabin window directly into the truck's driver's seat and started the vehicle.  ECF No. 66 at PageID #: 533, ¶ 27; Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 700.  While officers continued shouting commands for Wild to show his hands, loud bangs can be heard on the various body camera recordings as Deputy Garito and Officer Pishotti unsuccessfully attempted to break the passenger-side window with their rifles.  ECF No. 66 at PageID #: 533, ¶ 28; Pishotti dep. Tr., ECF No. 67-2 at PageID #: 597, 5:15–20.  Sgt. Bonar repositioned himself atop a pile of bricks about 20 feet in front of the truck.[6]  Bonar Aff., ECF No. 69-2 at PageID #: 1413, ¶ 21; see Moran Aff. Ex. A-3 (Grimm BWC), ECF No. 69-1 at

---

[6] In his written statement to investigators, Sgt. Bonar said that he was standing on a "stack of pallets".  ECF No. 64-1 at PageID #: 433.  Regardless, the video evidence shows Bonar was standing atop debris close to the snowplow attached to the truck.  See, e.g., Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 756.

(4:24CV285)

PageID #: 678.  Officer Smith was behind a tree to Sgt. Bonar's rear left.  Officer Ellwood-Bellas and Lt. Grimm were directly behind Sgt. Bonar.  Bonar dep. Tr., ECF No. 64-1 at PageID ##: 399–400, 18:23–19:3.  Officer Boyle stood against the cabin near the truck's front bumper.  Boyle Aff., ECF No. 69-4 at PageID #: 1422–23, ¶¶ 20, 24.

Wild revved the pickup's engine before accelerating with a "full gas pedal" causing the back tires to send dirt and gravel flying, drove over a small tree, and almost hit Sgt. Bonar and Trooper Boyle before veering away at the last second.  Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 730; Boyle Aff., ECF No. 69-4 at PageID #: 1423, ¶¶ 24–26.  Officers Smith, Ellwood-Bellas, and Lt. Grimm were positioned behind Sgt. Bonar, prompting them to shout, "look out, look out."  Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 815.  Defendants Bonar, Pishotti, Garito, Dean, and Smith discharged their weapons, collectively firing 13 shots (Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 816) and striking Wild five times before the truck came to a stop.  *See* Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 717.  Officers approached the pickup and confirmed that Wild was dead.

The Ohio Attorney General's Bureau of Criminal Investigation ("BCI"), led by Special Agent Charles Moran, investigated the shooting.  Moran Aff. Ex. A-7, ECF No. 69-1 at PageID ##: 689–817.  BCI interviewed all the officers involved, Mr. Adkins, and Wild's friends and family, including Plaintiff.  It gathered records, documents, photographs, items, and conducted several tests.  Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 816.  On completion, the report was turned over to the Trumbull County Prosecutor, who determined that the shooting was justified and declined to bring charges against any of the officers involved.

8

(4:24CV285)

## II.    LEGAL STANDARD

"Summary judgment is appropriate when 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"  *Scola v. Publix Supermarkets, Inc.*, 557 F. App'x 458, 462 (6th Cir. 2014) (quoting Fed. R. Civ. P. 56(a)).  The fact under dispute must be "material," and the dispute must be "genuine."  A fact is "material" if its resolution will affect the outcome of the lawsuit.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).  In determining whether a factual issue is "genuine," the Court assesses whether the evidence is such that a reasonable jury could find that the non-moving party is entitled to a verdict.  *Id*.  ("[Summary judgment] will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party").

The moving party is not required to file affidavits or similar materials negating a claim on which its opponent bears the burden of proof, so long as the movant relies on the absence of an essential element in the pleadings, depositions, answers to interrogatories, and admissions on file.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "The trial court is not required to search the entire record to establish that a genuine issue of material fact exists."  *Malee v. Anthony & Frank Ditomaso, Inc.*, No. 1:16CV490, 2018 WL 1805402, at *2 (N.D. Ohio Apr. 16, 2018) (citing *Tucker v. Tennessee*, 539 F.3d 526, 531 (6th Cir. 2008)) (abrogated on other grounds).  "'[I]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c),' the court may determine that fact is undisputed."  *Malee,* 2018 WL 1805402, at *2 (quoting Fed. R. Civ. P. 56(e)(2)).

To survive summary judgment, the non-moving party "must 'do more than simply show that there is some metaphysical doubt as to the material facts.'"  *Baker v. City of Trenton*, 936 F.3d 523, 529 (6th Cir. 2019) (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*,

9

(4:24CV285)

475 U.S. 574, 587 (1986)).  Once the movant makes a properly supported motion, the burden

shifts to the non-moving party to demonstrate the existence of a genuine dispute.  An opposing

party may not simply rely on its pleadings; rather, it must "produce evidence that results in a

conflict of material fact to be resolved" by a factfinder.  *KSA Enterprises, Inc. v. Branch Banking*

*& Tr. Co.*, 761 F. App'x 456, 464 (6th Cir. 2019) (quoting *Cox v. Ky. Dep't of Transp.*, 53 F.3d

146, 150 (6th Cir. 1995)).  "The mere existence of a scintilla of evidence in support of the

plaintiff's position will be insufficient; there must be evidence on which the jury could

reasonably find for the plaintiff."  *Srouder v. Dana Light Axle Mfg., LLC*, 725 F.3d 608, 613 (6th

Cir. 2013) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986)).  In analyzing a

motion for summary judgment, the Court "must view the evidence in the light most favorable to

the nonmoving party."  *Lossia v. Flagstar Bancorp, Inc.*, 895 F.3d 423, 428 (6th Cir. 2018)

(citing *Latits v. Phillips*, 878 F.3d 541, 547 (6th Cir. 2017)).

### III.  DISCUSSION

Defendants move for summary judgment, claiming entitlement to qualified immunity

because the shooting was reasonable under the Fourth Amendment.  Deputy Garito and Officers

Smith and Pishotti also assert that they are entitled to political subdivision immunity under Ohio

Rev. Code Ch. 2744.  Sgt. Dean argues that Plaintiff's claims fail as a matter of law because he

cannot identify which officer was responsible for the fatal shot.  Plaintiff opposes each motion in

a single, five-page brief, in which he argues that there is a genuine issue of material fact as to

when Defendants fired their weapons.  ECF No. 76.

### A.  Danny Lane's Affidavit is Stricken.

To support his opposition to Defendants' motions for summary judgment, Plaintiff

included an affidavit and investigation report from Danny Lane, a purported projectionist who

10

(4:24CV285)

evaluated each officer's body-worn camera videos frame by frame.  ECF No. 76 at PageID #: 1783.  Defendants moved to strike the affidavit, arguing that Plaintiff surreptitiously included an expert witness affidavit to support his summary judgment opposition.  ECF No. 79; ECF No. 80; ECF No. 81; ECF No. 82.  According to Defendants, Plaintiff failed to timely identify his expert witness and cannot now rely on statements from an undisclosed expert or witness to support his arguments.  ECF No. 79 at PageID ##: 1898–99; ECF No. 80 at PageID #: 1904; ECF No. 81 at PageID #: 1913–15; ECF NO. 82 at PageID #: 1922.  Plaintiff retorts that Mr. Lane is neither an expert, nor a witness, and that he merely provided a frame-by-frame analysis of the body camera videos.  ECF No. 83.  Plaintiff's argument is not well taken.

Plaintiff previously moved for leave to identify his expert witness and submit his expert report after the expert discovery cutoff expired.  ECF No. 54.  In that motion, Plaintiff's proposed expert, Patrick Michael Mays, indicated that he had worked with Mr. Lane to review and analyze the body camera videos to determine when Defendants fired their weapons.  ECF No. 54.  The Court denied Plaintiff's motion and excluded his expert witness' testimony and report because: (1) Plaintiff failed to provide good cause for his failure to comply with the Case Management Conference Order (ECF No. 30); (2) the motion was filed 28 days after the cutoff for identifying expert witnesses and providing expert reports to opposing counsel expired; and (3) Defendants would be prejudiced by the untimely insertion of expert evidence.  ECF No. 56 at PageID #: 293.

Now Plaintiff attempts to rely on Mr. Lane's review and findings by recharacterizing him as merely a "projectionist," claiming that he provided services like Defendants' projectionist, Charles Moran.  ECF No. 76 at PageID #: 1779 n.3.  Plaintiff misapprehends the role of Charles Moran.  He was not "Defendants' Projectionist" but the lead BCI investigator and a witness of

11

(4:24CV285)

whom Plaintiff was aware and could have deposed before the close of discovery. *See, e.g.,* Moran Aff., ECF No. 69-1. The same cannot be said for Mr. Lane, whom Plaintiff failed to timely identify or make available to Defendants for deposition concerning his review and findings. *See* Fed. R. Civ. P. 37(c)(1) ("If a party fails to provide information or identify a witness as required by Rule 26(a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless."). The Court ordered that Plaintiff's untimely expert testimony and report be excluded. ECF No. 56; *see Pride v. BIC Corp.*, 218 F.3d 566, 578–79 (6th Cir. 2000) (recognizing that district courts have broad discretion to exclude expert-witness testimony, including affidavits, that are untimely disclosed). Because the Court has excluded Mr. Lane's testimony and report, and because Defendants were not provided an opportunity to confront Mr. Lane regarding the same, his affidavit and all attachments thereto are stricken from the record.

### B. Excessive Force and Qualified Immunity Legal Framework

To succeed on his excessive force claims under 42 U.S.C. § 1983, Plaintiff must demonstrate: (1) Wild's rights secured by the Constitution or federal law were violated; (2) by a person or persons acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). Excessive force claims—as in this case—are assessed under the Fourth Amendment, which protects against unreasonable search and seizures, including the unreasonable use of deadly force against a fleeing suspect. *See Barnes v. Felix*, 605 U.S. 73, 76 (2025) (citing *Graham v. Connor*, 490 U.S. 386, 397 (1989)). "A police officer's use of deadly force violates the Fourth Amendment when it is not 'objectively reasonable.'" *Id*. "Whe[n] the officer has probable cause to believe that the suspect poses a threat of serious harm, either to the officer or to others, it is not

12

(4:24CV285)

constitutionally unreasonable to prevent escape by using deadly force." *Tennessee v. Garner,* 471 U.S. 1, 11 (1985).

Once a constitutional violation has been established, a defendant may raise the qualified immunity defense, which is available to government officials against claims that "arise from the performance of their discretionary functions." *Meeks v. Larsen,* 999 F. Supp. 2d 968, 977 (E.D. Mich. 2014), *aff'd,* 611 F. App'x 277 (6th Cir. 2015).  When the qualified immunity defense is raised, it becomes the plaintiff's burden to show the defendant is not entitled to immunity. *Mosier v. Evans,* 90 F.4th 541, 546 (6th Cir. 2024) (citing *Burgess v. Fischer,* 735 F.3d 462, 472 (6th Cir. 2013)).  When faced with summary judgment, a plaintiff must show that, based on the record, a reasonable jury could find: (1) the defendants violated a constitutional or statutory right; and (2) that right was clearly established at the time of the alleged violation. *Id.*; *see Francis v. Huff,* No. 22-5282, 2022 WL 7973109, at *2 (6th Cir. Oct. 14, 2022) (citing *Cunningham v. Shelby Cty.,* 994 F.3d 761, 764 (6th Cir. 2021)) (same).  The Court may exercise its discretion in deciding which prong to address first. *Pearson v. Callahan,* 555 U.S. 223, 236 (2009).  If a plaintiff fails to satisfy one prong, the other need not be addressed. *Mosier,* 90 F.4th at 546.

Recognizing that police often must "make split-second judgments" in dangerous situations, both the Supreme Court and the Sixth Circuit admonish district courts to judge the "reasonableness of the moment" from the perspective of a reasonable officer at the scene, rather than with "the 20/20 vision of hindsight." *Williams v. City of Canton, Ohio,* 168 F.4th 933, 940 (6th Cir. 2026) (citing *Plumhoff v. Rickard,* 572 U.S. 765, 775 (2014)).  Thus, "[e]ven if an officer's assessment of a situation is ultimately wrong, there is no Fourth Amendment violation if 'a dangerous situation evolved quickly to a safe one before the police officer had a chance to

13

(4:24CV285)

realize the change.'" *Francis*, 2022 WL 7973109, at \*2 (quoting *Cass v. City of Dayton*, 770 F.3d 368, 375 (6th Cir. 2014)); *see Pearson*, 555 U.S. at 231.  That a situation evolves quickly "does not, by itself, permit [officers] to use deadly force." *Kirby v. Duva*, 530 F.3d 475, 483 (6th Cir. 2008) (quoting *Smith v. Cupp*, 430 F.3d 766, 775 (6th Cir. 2005)) (brackets in original).

The Supreme Court instructs courts to balance three non-exhaustive factors when assessing the reasonableness of an officer's use of force: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to flee.  *Francis*, 2022 WL 7973109, at \*2 (citing *Graham*, 490 U.S. at 396).  The second factor is the most critical.  *Hicks v. Scott*, 958 F.3d 421, 435 (6th Cir. 2020) (citing *Mullins v. Cyranek*, 805 F.3d 760, 76 (6th Cir. 2015)).

Urging district courts to assess reasonableness under the totality of the circumstances, the Sixth Circuit articulates additional factors, including: (1) why the officers were called to the scene; (2) whether the officers knew or reasonably believed the individual was armed; (3) whether the individual verbally or physically threatened the officers or disobeyed commands; (4) the distance between the officer and the individual; (5) the duration of the encounter; (6) whether the officers were aware of any ongoing mental or physical health conditions potentially affecting the individual's response to officers; and (7) whether less forceful tactics could have been employed to de-escalate the situation.  *Palma v. Johns*, 27 F.4th 419, 432 (6th Cir. 2022) (internal citations omitted).

The third *Graham* factor—whether the suspect was actively resisting arrest or attempting to flee—weighs in Defendants' favor.  It is undisputed that Wild was not complying with the officers' commands and was attempting to flee the scene in a stolen vehicle.  ECF No. 66 at PageID #: 533, ¶ 27.  The third *Palma* factor—whether the individual was disobeying

14

(4:24CV285)

commands—weighs in Defendants' favor for the same reason.  Similarly, the first *Graham* factor—the severity of the crime at issue—weighs in Defendants' favor.  Wild had an outstanding arrest warrant for felony vandalism (ECF No. 66 at PageID #: 531, ⁋ 3; Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 711), and had led police on two high-speed chases in the three days preceding, with one having occurred just hours before the shooting.  ECF No. 66 at PageID ##: 531–32, ⁋⁋ 5–8.  The dispositive factor in this case is the second *Graham* factor: whether Wild posed an immediate threat to the safety of the officers or others.  *See Garner*, 471 U.S. at 11.  As discussed below, this factor, along with several *Palma* factors, weigh in favor of most of the defendants.

### C. Deadly Force Against a Fleeing Vehicle

When responding to a fleeing vehicle, officers may employ deadly force if they have "'reason to believe that the fleeing car present[s] an imminent danger' to 'officers and members of the public.'"  *Francis*, 2022 WL 7973109, at *3 (citing *Cupp*, 430 F.3d at 775) (cleaned up).  Deadly force against a driver is justified when the driver "objectively appears ready to drive into an officer or bystander with [the driver's] car."  *Cass*, 770 F.3d at 375 (quoting *Hermiz v. City of Southfield*, 484 F. App'x 13, 16 (6th Cir. 2012)).

Conversely, deadly force is unreasonable when "the officer was to the side of the moving car, or the car had already passed him—taking the officer out of harm's way—when the officer shot the driver."  *Gordon v. Bierenga*, 20 F.4th 1077, 1083 (6th Cir. 2021) (quoting *Latits v. Phillips*, 878 F.3d 541, 549 (6th Cir. 2017) (collecting cases)); *see Kirby*, 530 F.3d at 482–83 (holding that officers were not entitled to qualified immunity because they had ample opportunity to realize before shooting a fleeing driver that no one was in his immediate path and he posed no imminent threat of harm.).  That no bystanders were directly in the vehicle's path,

15

(4:24CV285)

however, is not, by itself, dispositive of whether a officer's use of force was reasonable.  *See Latits, 878 F.3d at 549*.  Police officers may continue to fire at a fleeing vehicle, even if no one is in its direct path, when "the officer's prior interactions with the driver suggest that the driver will continue to endanger others with his car."  *Cass, 770 F.3d at 375* (citing *Hermiz, 484 F. App'x at 16*); *see Francis, 2022 WL 7973109, at *3* (citing *Cass, at 375*).  The Supreme Court recently explained that "[p]rior events may show . . . why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening."  *Barnes, 605 U.S. at 80*; *see, e.g., Plumhoff, 572 U.S. at 776* (holding officers' use of deadly force was reasonable in light of the decedent's "outrageously reckless driving [that] posed a grave public safety risk" and his continued attempts to escape in his vehicle.).

Accordingly, the Court must assess whether, based on the totality of the circumstances, a reasonable officer in each Defendant's position would have had probable cause to believe that Wild posed a danger to the officers or the public.  *Garner, 471 U.S. at 11*.

### D. Fourth Amendment Violation Analysis

Plaintiff contends that Defendants' use of deadly force was unreasonable and, therefore, a violation of Wild's Fourth Amendment rights because: (1) at least two officers began shooting six seconds before Wild started the truck; (2) Wild drove the truck forward at a slow rate of speed; and (3) no one was in the truck's direct path.  ECF No. 76 at PageID ##: 1779–81.  Plaintiff's first two arguments lack merit and are directly contradicted by video evidence.  His third requires closer examination.

1. *Defendants did not shoot Wild before started the truck.*

Plaintiff first argues that at least two officers fired on Wild before he started the truck.  ECF No. 76 at PageID ##: 1779–81.  Although the Court must adopt Plaintiff's version of the

16

(4:24CV285)

facts, *see Scott*, 550 U.S. at 378, it cannot "adopt a version . . . that is blatantly contradicted by video footage that is not doctored or altered in any way, and which clearly depicts the events that actually happened." *Shumate v. City of Adrian*, 44 F.4th 427, 438 (6th Cir. 2022).

Plaintiff points to the loud bangs heard on the body camera recordings before Wild started the truck and accelerated forward, arguing that these bangs were gunshots. Plaintiff relies on a portion of the BCI's frame-by-frame video analysis, which states: "The truck did not appear to be moving forward. A muzzle flash, a light and an opaque light-colored cloud was observed on the right side of the video screen. This was likely a gunshot from a rifle fired by another officer (possibly Smith)[.]" ECF No. 76 at PageID ##: 1780 (citing Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 803). Plaintiff's reliance is misplaced. This analysis does not concern the banging heard before Wild started the truck. It refers to gunfire recorded approximately 3.2 seconds *after* Wild had driven forward. Indeed, earlier sections of BCI's frame-by-frame video analysis reveal that Wild began driving *before* the first gunshot. *See, e.g.,* Moran Aff. Ex. A-7, ECF 69-1 at PageID #: 781 ("[T]he truck had driven forward . . . a few frames *before* the first (1) gunshot fired[.]") (emphasis added). The BCI analysis cited does not support Plaintiff's claim that officers fired before Wild started the truck.

Plaintiff also argues that Sgt. Bonar's body camera recording depicts "lights appearing at the tips of both rifles" and refers to these as "muzzle flashes" as described by defense expert Samuel Faulkner during his deposition. ECF No. 76 at PageID #: 1781. Contrary to Plaintiff's claims, however, Mr. Faulkner testified that no gunfire was recorded prior to the truck moving forward:

> Q:  Right.  But you can see the gunshot, the light coming from the rifle.
>
> A:  You – you will –

17

(4:24CV285)

> Q: If I'm shooting in the dark, you can see – when I discharge, you can see a light, correct?
>
> A: When they're hitting the window, you can see the front of the patrol rifle. There were no shots fired, so there are no flashes to go by. It's clear on the video.
>
> Q: There's no flashes?
>
> A: No sir. They were – they were hitting the window with the barrel of the patrol rifle.
>
> Q: Yes. I understand that.
>
> A: There are no flashes there because there were no gunshots – no deformation to the window.

Faulkner dep. Tr., ECF No. 63-1 at PageID ##: 328–29, 15: 21–16:12.

Mr. Faulkner's unrebutted expert testimony is supported by the body camera recordings from multiple officers, including Sgt. Bonar, which do not show "muzzle flashes" or any other indicators of gunfire before Wild started the truck. Rather, the recordings show the banging was caused by Deputy Garito and Officer Pishotti hitting the passenger window with their rifle muzzles in unsuccessful attempts to break the glass and stop the vehicle. Not only did Plaintiff stipulate to this fact, *see* ECF No. 66 at PageID #: 533, ¶ 28, but the body camera recordings from Lt. Grimm, *see* Moran Aff. Ex. A-3 (Grimm BWC), ECF No. 69-1 at PageID #: 678 [timestamp: 01:16:00–03], and Trooper Boyle, *see* Moran Aff. Ex. A-4 (Boyle BWC), ECF No. 69-1 at PageID #: 681 [timestamp: 01:16:14–16], clearly depict it. While striking a window with the muzzle of a rifle is ill-advised, it neither constitutes nor resulted in the use of deadly force. The video evidence confirms that the first gunshots occurred approximately seven seconds *after* Wild started the truck and 2.73 seconds *after* he accelerated forward. *See, e.g.,* Moran Aff. Ex.

18

(4:24CV285)

A-2 (Bonar BCW),[7] ECF No. 69-1 at PageID #: 675 [timestamp: 1:16:13–19]; Moran Aff. Ex.

A-7, ECF No. 69-1 at PageID #: 814.  Plaintiff's claim that Defendants shot at Wild before the

vehicle was started is "blatantly contradicted" by the record.  *See Shumate, 44 F.4th at 438*.

2.  *Wild accelerated quickly while at least one officer was in front of the truck.*

Next, Plaintiff claims that qualified immunity does not attach because the evidence shows

(or, alternatively, that there is a genuine issue of material fact) that no one was in the truck's

direct path and that the truck was moving at a slow rate of speed when police fired on it.  ECF

No. 76 at PageID ##: 1780–81.  The record supports neither claim.

First, the Court addresses Plaintiff's claim that Wild was driving at a slow speed.  In his

written statement to investigators, Sgt. Bonar said that Wild had the gas pedal completely down

and that once the truck gained traction, it accelerated rapidly.  *See* Bonar dep. Ex. 1 (Bonar

Statement), ECF No. 64-1 at PageID #: 433.  Officer Pishotti reported that once Wild started the

truck, he "immediately slammed on the gas, spinning the tires" and further testified that "as soon

as [Wild] got traction he was moving pretty good."  Pishotti dep. Tr., ECF No. 67-2 at PageID

##: 599–600, 7:8–8:2.  Officer Smith also testified that although he could not recall how fast the

truck was moving, "it was fast enough that [an officer] had to jump" to avoid being hit.  Smith

dep. Tr., ECF No. 67-1 at PageID #: 551, 13:17–22.  Those statements are buttressed by the body

camera videos, which recorded the sound of the engine revving and the back tires spinning in the

dirt for approximately 4.3 seconds before the truck lurched forward.  *See, e.g.*, Moran Aff. Ex.

A-1 (Dean BWC-2), ECF No. 69-1 at PageID #: 672, [timestamp: 01:16:16–20].  Indeed, Wild

---

[7] Plaintiff also submitted as evidence Sgt. Bonar's body camera recording which depicts the same course of events.  *See also* Plf. Ex. B-2, ECF No. 76.  For ease of reference, the Court will use ECF No. 69-1 when citing to Sgt. Bonar's body camera recording.

19

(4:24CV285)

gained enough speed to run over a small tree directly in front of the truck. Moran Aff. Ex. A-1 (Dean BWC-2), ECF No. 69-1 at PageID #: 672 [timestamp: 01:16:18–20]. To claim Wild was driving slowly ignores the clear video evidence that, although not moving at top speed, the truck was accelerating rapidly such that it posed a significant risk to anyone in front of it.

Next, the record shows that Sgt. Bonar was in the truck's direct path as it accelerated forward. Prior to Wild starting the truck, multiple body camera recordings show that two officers moved forward and positioned themselves in front of the truck. Trooper Boyle stood against the cabin wall, near the driver's side front bumper (*see, e.g.,* Moran Aff. Ex. A-4 (Boyle BWC), ECF No. 69-1 at PageID #: 681 [timestamp: 1:16:03–13]), and Sgt. Bonar directly in front of the truck on a pile of debris. *See, e.g.,* Moran Aff. Ex. A-2 (Bonar BCW), ECF No. 69-1 at PageID #: 675 [timestamp: 1:16:08–13]. Then, Wild started the truck, revved the engine, and accelerated forward, forcing Trooper Boyle to jump out of the way to avoid being struck, while Sgt. Bonar remained in front of the truck. *See, e.g.,* Moran Aff. Ex. A-4 (Boyle BWC), ECF No. 69-1 at PageID #: 681 [timestamp: 01:16:16–20]; Moran Aff. Ex. A-2 (Bonar BCW), ECF No. 69-1 at PageID #: 675 [timestamp: 1:16:13–17]. The BCI analysis of Trooper Boyle's body camera recording confirms that Wild drove directly towards Sgt. Bonar without braking. Moran Aff., Ex. A-7, ECF No. 69-1 at PageID #: 778; *see* Moran Aff. Ex. A-4 (Boyle BWC), ECF No. 69-1 at PageID #: 681 [timestamp: 01:16:19–20]. Approximately 2.73 seconds later, the first gunshots can be heard. *See, e.g.,* Moran Aff. Ex. A-4 (Boyle BWC), ECF No. 69-1 at PageID #: 681 [timestamp: 01:16:20–21]; Moran Aff. Ex. A-2 (Bonar BCW), ECF No. 69-1 at PageID #: 675 [timestamp: 1:16:17–18]; Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 814. Therefore, Plaintiff's claim that no one was in front of the truck as he drove it forward is contradicted by the evidence.

20

(4:24CV285)

There remains, however, a question as to whether Wild swerved away from Sgt. Bonar, and whether the individual Defendants realized that a dangerous situation had evolved into a safe one before firing.

### E.  Imminent Threat Analysis

Although the record shows that Sgt. Bonar was in front of the truck as Wild tried to flee, it also shows that Wild swerved away from Sgt. Bonar at the last second.  *See, e.g.,* Bonar Aff., ECF No. 69-2 at PageID ##: 1413–14, ¶¶ 27–32.  The Court must assess whether a reasonable officer in Defendants' respective positions would have had probable cause to believe that Wild posed an immediate danger to Sgt. Bonar, other officers, or the public.

1.  *Defendants Garito, Pishotti, and Dean*

Based on the uncontested record, the Court concludes that Defendants Garito, Pishotti, and Dean acted reasonably under the totality of the circumstances and therefore did not violate the Fourth Amendment.

The video evidence shows that Deputy Garito, Officer Pishotti, and Sgt. Dean were positioned along the passenger-side of the truck.  As Wild started the vehicle, Deputy Garito and Officer Pishotti attempted to break the passenger-side window, with Deputy Garito using the muzzle of his gun.  Garito Aff., ECF No. 70-5 at PageID #: 1627, ¶ 13; Pishotti dep. Tr., ECF No. 67-2 at PageID #: 596, 5:13–20.  Such efforts caused the gun to release its magazine, leaving Deputy Garito with one bullet in the chamber, which he did not fire until after Wild had begun to drive.  Garito Aff., ECF No. 70-5 at PageID #: 1627, ¶¶ 15, 20.  The BCI investigation confirmed as much in its final report.  Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 745.[8]  As

---

[8] Moran's report describes Deputy Garito's "gun" as a "rifle."  ECF No. 69-1 at PageID #: 744.

(4:24CV285)

explained above, none of the defendants fired their weapons until after Wild had accelerated forward.

Although Deputy Garito, Officer Pishotti, and Sgt. Dean acknowledge that they were not in imminent danger, the evidence supports their beliefs that they were concerned about Wild running over other officers in his attempt to flee.  Deputy Garito averred that he believed an officer was positioned "extremely close to the truck and/or in the direct pathway of the truck" and that he fired his weapon out of concern that the officer was in immediate danger of being run over.  Garito Aff., ECF No. 70-5 at PageID ##: 1627–28, ⁋⁋ 19–21.  He also described Wild's demeanor as "alarming" and "as if nobody was home."  Garito Aff., ECF No. 70-5 at PageID #: 1627, ⁋ 16.  Officer Pishotti testified that he fired his weapon when he saw Wild driving towards the officers standing near the front of the truck.  Pishotti dep. Tr., ECF No. 67-2 at PageID ##: 597, 600, 5:24–25, 8:8–16.  Similarly, Sgt. Dean stated that he fired a single shot, believing "it was clear . . . that Mr. Wild was going to run someone over."  Dean Aff., ECF No. 74-1 at PageID ##: 1724–25, ⁋⁋ 15–16.  Such concerns were bolstered by Defendants' knowledge of Wild's previous (and recent) efforts to evade police in two high-speed chases and statements from his friends that Wild had no intention of complying with police.  Garito Aff., ECF No. 70-5 at PageID #: 1628, ⁋ 23; Pishotti dep. Tr., ECF No. 67-2 at PageID #: 603, 11:21–24; ECF No. 66 at PageID ##: 531–32, ⁋⁋ 3, 5–8, 15.

Plaintiff identifies no evidence contradicting those accounts, which are supported by the video recordings and other uncontroverted evidence in the record.  As discussed above, at least one officer (Sgt. Bonar) was directly in front of the truck as Wild revved the engine and accelerated forward.  Neither does Plaintiff demonstrate that Deputy Garito, Officer Pishotti, or Sgt. Dean saw or realized that Wild had swerved away from Sgt. Bonar before firing their

22

(4:24CV285)

weapons.  In fact, Officer Pishotti explicitly testified that he did *not* see Wild turn away from the path of hitting Sgt. Bonar.  Pishotti dep. Tr., ECF No. 67-2 at PageID ##: 601–02, 9:25–10:2.

Furthermore, the record demonstrates these events occurred in the dark and over so short a period of time as to inhibit these Defendants' ability to quickly realize that a dangerous situation had changed to a safe (or safer) one.  *See Francis*, 2022 WL 7973109, at *2.  Not only did the truck's position obstruct Defendants' view of the officers in front of it, but the videos also show that from the time Wild drove the car forward and the first gunshot was approximately 2.73 seconds, with all the gunfire lasting only 3.2 seconds.  Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 814.  Deputy Garito, Officer Pishotti, and Sgt. Dean each had to make a split-second decision whether to use deadly force to stop Wild from hitting an officer in the path of Wild's fleeing truck.

Based on the record, a reasonable officer in the same position as Deputy Garito, Officer Pishotti, or Sgt. Dean would have probable cause to believe that Wild posed an immediate threat to the officers in front of the truck as he attempted to flee.  *Cass*, 770 F.3d at 375 (citing *Hermiz,* 484 F. App'x at 16) ("An officer is justified in using deadly force against 'a driver who objectively appears ready to drive into an officer or bystander with his car.'").  As such, Deputy Garito, Officer Pishotti, and Sgt. Dean's discharging of their weapons was reasonable based on the totality of the circumstances and, therefore, did not violate Wild's Fourth Amendment rights.  Because there is no constitutional violation, the Court need not address the second "clearly established right" prong of qualified immunity.  *See Mosier*, 90 F.4th at 546.  Similarly, the Court need not address Sgt. Dean's argument that Plaintiff cannot identify which bullet was responsible for Wild's fatal wounds.  Defendants Garito, Pishotti, and Dean's motions for summary judgment regarding Plaintiff's § 1983 claims are granted.

23

(4:24CV285)

> 2. *Defendant Bonar*

Sgt. Bonar's actions were also reasonable based on the totality of the circumstances. Even if Sgt. Bonar's conduct were unreasonable, the law at the time of the shooting did not clearly establish that such conduct would violate the Constitution and, therefore, he remains entitled to qualified immunity. *Brosseau v. Haugen*, 543 U.S. 194, 199–200 (2004).

> a. Defendant Bonar's use of a deadly force was reasonable.

Plaintiff begins by arguing that Sgt. Bonar "finished [Wild] off with a 'close-range' shot to [Wild's] head," pointing to Defendants' expert witness and the autopsy report for support. ECF No. 76 at PageID #: 1780 (citing Faulkner dep. Tr., ECF No. 63-1 at PageID #: 328 and Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 717). That contention misrepresents the record.

Mr. Faulkner testified that Sgt. Bonar admitted to firing first, not that he shot Wild in the head and "finished him off." ECF No. 63-1 at PageID #: 328, 15:6–11. The autopsy report merely indicates that Wild suffered a gunshot wound to the "posterior head . . . centered at the left occipital scalp characterized by a large primary penetrating defect." Moran Aff. Ex. A-7, ECF No. 69-1 at PageID ##: 717–18. It does not identify any specific Defendant as having caused that wound. Indeed, the BCI laboratory could not confirm which rounds were fired from which rifles. Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 816. Plaintiff offers no forensic evidence or testimony supporting his claim that it was Sgt. Bonar who shot Wild in the head.

The record supports Sgt. Bonar's claim that he reasonably believed Wild posed an immediate threat to other officers. Sgt. Bonar averred (and video evidence confirms) that he positioned himself on a pile of debris about 20 feet in front of the truck and "directly in its path." Bonar Aff., ECF No. 69-2 at PageID #: 1413, ¶ 21; *see* Moran Aff. Ex. A-3 (Grimm BWC), ECF No. 69-1 at PageID #: 678. Sgt. Bonar stated that there were several officers positioned behind

24

(4:24CV285)

him and along the gravel driveway, although he did not know precisely where each stood.  Bonar Aff., ECF No. 69-2 at PageID #: 1413, ₽ 22.  Video evidence confirms that Officer Ellwood-Bellas and Lt. Grimm were behind Sgt. Bonar, taking cover behind some trees as Wild drove forward.  Officer Smith was also behind Sgt. Bonar near the driveway.  *See, e.g.,* Moran Aff. Ex. A-3 (Grimm BWC), ECF No. 69-1 at PageID #: 678; Moran Aff. Ex. A-7, ECF No. 69-1 at PageID ##: 779–85, 789–91.  Sgt. Bonar acknowledged that, although he was the first to fire his weapon, *see* Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 760, he did not shoot when Wild first accelerated towards him, explaining that he lacked a clear line of sight and was concerned about crossfire with the other officers.  Bonar Aff., ECF No. 69-2 at PageID #: 1413, ₽₽ 19–21; Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 760.  Rather, Sgt. Bonar fired only after Wild veered away from him, claiming he feared for the safety of the officers behind him.  Bonar Aff., ECF No. 69-2 at PageID ##: 1413–14, ₽₽ 27–32.  Sgt. Bonar also explained that the truck was accelerating towards where he had seen officers seconds before and was concerned they would be run over.  Bonar Aff., ECF No. 69-2 at PageID #: 1413, ₽₽ 27–28; Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 760–61.

Sgt. Bonar's concerns were bolstered by his knowledge of Wild's erratic and reckless behavior both during and prior to this encounter.  *See Barnes*, 605 U.S. at 80 ("Prior events may show . . . why a reasonable officer would have perceived otherwise ambiguous conduct of a suspect as threatening.").  Like the other Defendants, Sgt. Bonar knew that Wild had evaded police in two high-speed chases and stolen a vehicle.  Bonar Aff., ECF No. 69-2 at PageID #: 1412, ₽ 11.  And he had witnessed Wild ignore police commands, jump from the cabin's window into the truck, and attempt to flee.  Bonar Aff. ECF No. 69-2 at PageID #: 1413, ₽₽ 19–21.  As Wild put the truck in drive, revved the engine, and spun the tires, Sgt. Bonar saw Trooper Boyle

25

(4:24CV285)

jump out of the way before the truck accelerated directly towards him.  Bonar Aff., ECF No. 69-2 at PageID #: 1413, ¶ 23.  These claims are supported by the video evidence.  *See* Moran Aff. Ex. A-2 (Bonar BWC), ECF No. 69-1 at PageID #: 675 [timestamp: 1:16:13–19]; Moran Aff. Ex. A-4 (Boyle BWC), ECF No. 69-1 at PageID #: 681 [timestamp: 1:16:13–20].

Moreover, the speed at which the situation escalated required Sgt. Bonar to make a split-second decision.  *See Mullins*, 805 F.3d at 766–67 (citing *Godawa v. Byrd*, 798 F.3d 457, 465 (6th Cir. 2015)) ("[Q]ualified immunity is available only whe[n] officers make split-second decisions in the face of serious physical threats to themselves or others.").  As earlier indicated, the time between Wild accelerating forward and the first shot was approximately 2.73 seconds, and the entire shooting lasted just 3.2 seconds.  *See* Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 814.  Observing Wild accelerate towards him, and then towards the last known position of his fellow officers, Sgt. Bonar reasonably believed they were in jeopardy and that he only had seconds to act to prevent their imminent serious bodily injury.  *See Mullins*, 805 F.3d at 766 ("[I]n analyzing the reasonableness of the [officer's] use of force, we must look at [the suspect's] behavior immediately prior to the moment he was shot.").  Based on the record, the totality of the circumstances demonstrates that a reasonable officer in Sgt. Bonar's position would have had probable cause to believe that Wild posed an immediate danger to the officers behind him.  Therefore, Defendant Sgt. Bonar's conduct was not unreasonable and did not violate Wild's Fourth Amendment rights.

b.  The "clearly establish right" prong is not satisfied.

Assuming, *arguendo*, that Sgt. Bonar's conduct violated a constitutional right, Plaintiff's claim fails because that right was not clearly established at the time of the shooting.  "A clearly established right is one that is sufficiently clear that every reasonable official would have

26

(4:24CV285)

understood that what he is doing violates that right." *Latits*, 878 F.3d at 552 (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)).  Although it is well settled that police may not use deadly force to stop a non-dangerous suspect from fleeing, *see Garner*, 471 U.S. at 9, "outside of the 'obvious case,' general principles established in *Garner* and *Graham* cannot clearly establish the law." *Gordon*, 20 F.4th at 1082 (citing *Rivas-Villegas v. Cortesluna*, 595 U.S. 1, 6 (2021)).

"Police officers are entitled to qualified immunity unless existing precedent 'squarely governs' the specific facts at issue." *Id*. (internal citations omitted).  This requires "existing precedent must have placed the statutory or constitutional question beyond debate." *Latits*, 878 F.3d at 552.  The controlling precedent must establish that the "particular conduct" is violative "in light of the specific context of the case." *Id*. (citing *Mullenix*, 577 U.S. at 12).  While precedent need not be directly on point, it must entail similar conduct and circumstances. *Mosier*, 90 F.4th at 546.

To defeat qualified immunity, Plaintiff bore the burden of identifying precedent that would have put Sgt. Bonar on clear notice that his conduct was unlawful. *Rivas-Villegas*, 595 U.S. at 6.  That case must have defined the right with a "high degree of specificity, so that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply." *Zorn v. Linton*, 146 S.Ct. 926, 930 (2026) (quoting *District of Columbia v. Wesby*, 583 U.S. 48, 63 (2018)) (cleaned up).  "In short, officers receive qualified immunity unless they could have read the relevant precedent beforehand and known that it proscribed their specific conduct." *Zorn*, 146 S. Ct. at 930 (quoting *City and County of San Francisco v. Sheehan*, 575 U.S. 600, 616 (2015)) (cleaned up).

In this case, Plaintiff did not identify any controlling jurisprudence from the Sixth Circuit or the Supreme Court showing that a reasonable police officer would have been on notice that his

27

(4:24CV285)

conduct, under the circumstances, clearly violated Wild's Fourth Amendment rights.  *See* ECF No. 76.  Sgt. Bonar points to *Burghardt v. Ryan*, 560 F. Supp. 3d 1093 (N.D. Ohio 2021) *aff'd by* No. 21-3906, 2022 WL 1773420 (6th Cir. June 1, 2022).  ECF No. 69 at PageID ##: 653–55.

In *Burghardt*, police were investigating a theft in the early hours of the morning when they approached the suspected get-away vehicle.  *Burghardt*, 560 F. Supp. 3d at 1097–98.  Surveillance camera and body camera video recordings depicted several police cars surrounded the vehicle before officers approached on foot, positioning themselves on all sides of the vehicle.  *Id*. at 1099–1100.  Rather than comply with police commands, the driver attempted to flee, causing the tires to squeal as he hit the gas pedal and reversed into one of the police cruisers.  *Id*. at 1101.  Unsure whether the suspect would attempt to flee by driving forward, two officers fired on the vehicle, fearing that the officers directly in front of it were in danger of being run over.  *Id*.  The district court concluded that the officers' actions were reasonable under the circumstances because the driver had demonstrated he was "desperate to escape," and that an officer was standing in the only path forward.  *Id*. at 1110.  The court explained that police were not required to wait until it was too late for the officer to safely retreat before acting.  In 2022, the Sixth Circuit affirmed, holding:

> That the van had already passed by the officers when they fired is not dispositive here, what matters is that it remained a threat to strike any of them when they opened fire.  *Williams v. City of Grosse Pointe Park*, 496 F.3d 482, 487 (6th Cir. 2007).  Thus, at the time of this shooting, no case from this court or the Supreme Court made clear that, under these circumstances, the officers could not open fire.

*Burghardt*, 2022 WL 1773420, at *2.

The case at bar is also factually similar to *Cass v. City of Dayton*, 770 F.3d 368 (6th Cir. 2014).  In *Cass*, police attempted to stop a vehicle in a parking lot after a controlled drug

28

(4:24CV285)

purchase.  As they approached the vehicle on foot, the driver floored the gas pedal, hitting two officers.  Fearful that other officers in the area may also be run over, one officer struck by the car fired a single shot and killed the car's passenger.  *Cass*, 770 F.3d at 372.  The Sixth Circuit held that the officer's response was objectively reasonable because the driver posed a continuing risk of harm to other police in the immediate area, especially after the driver had already run down two officers in his attempt to escape.  *Id*. at 376.

Although neither case is directly on point, they are factually similar because Wild was shot after he drove past the officers.  As *Burghardt* makes clear, that Wild had already passed Sgt. Bonar when he fired is not dispositive.  *See Burghardt*, 2022 WL 1883420, at *2.  What matters is whether Sgt. Bonar had probable cause to reasonably believe Wild posed an imminent threat of harm to others.  For the reasons discussed above, the answer is yes.  Although Wild did not hit anyone with his vehicle, as in *Cass*, he was not complying with police commands, accelerated directly towards Sgt. Bonar in his attempt to escape, and left Sgt. Bonar unsure whether the officers behind him could avoid being run over.  And again, the time between when Wild started driving forward and the first gunshot was just 2.73 seconds, demonstrating that Sgt. Bonar made a split-second decision.  Accordingly, no case from the Sixth Circuit or the Supreme Court put Sgt. Bonar on notice that his conduct would violate clearly established constitutional rights and.  Therefore, even if he violated the Fourth Amendment, he is entitled to qualified immunity.

Defendant Bonar's motion for summary judgment is granted.

3.  *Defendant Smith*

Officer Smith argues he is entitled to qualified immunity because Wild posed an imminent threat to the officers in front of the truck, forcing Officer Smith to make a "split-

(4:24CV285)

second" decision.  ECF No. 73 at PageID #: 1685.  While there is some support for this position, a reasonable jury could reach the opposite conclusion.

As discussed, it is generally unreasonable for police to shoot a fleeing driver who has already passed officers and does not pose an immediate threat of death or significant bodily injury to others.  *See Gordon*, 20 F.4th at 1083 (collecting cases).  In *Latits v. Phillips*, 878 F.3d 541 (6th Cir. 2017), the suspect fled after police initiated a late-night traffic stop and ordered him out of the vehicle.  Police chased him on a nearly[9] empty ten-lane highway, reaching 60 miles per hour.  *Id*. at 544–45.  They managed to push the suspect off the road, boxed him in with their cruisers, and approached on foot with weapons drawn.  The suspect drove forward slowly, hitting one of the police cars, then slowly reversed past an on-foot officer who shot and kill him.  *Id*. at 545–46.  The Sixth Circuit concluded the shooting was unreasonable because video evidence showed officers had time to realize the suspect was no longer an immediate threat.  *Id*. at 548.  It explained that no one was in the driver's direct path and the driver's intention was to flee, not to injure the officers.  *Id*. at 550.  The Court also held that the driver did not pose an imminent danger to the public because, although he had engaged in a police chase, he had driven on a virtually empty highway late at night with no intention to drive recklessly through residential areas.  *Id*.

Although not directly on point, *Latits* is instructive.  As in *Latits*, Defendants encountered Wild at night and in remote area where there was little concern he would immediately race down residential streets.  Furthermore, it is undisputed that Officer Smith was not in imminent danger

---

[9] During the thirty seconds of video, no pedestrians or non-police cars were visible on the highway.  Only a car parked two lanes away from the suspect was visible, at some point.  *Latits*, 878 F.3d at 545.

30

(4:24CV285)

as Wild drove by him.  Smith testified that he positioned himself behind a tree as the encounter progressed.  Smith dep. Tr., ECF No. 67-1 at PageID #: 546, 8:17.  From his position, Officer Smith was able to observe officers using their guns to bang on the passenger window, *see* Smith dep. Tr., ECF No. 67-1 at PageID ##: 549–50, 11:22–12:3, and he saw officers in front of the truck jumping out of the way to avoid being hit as Wild drove forward.  Smith dep. Tr., ECF No. 67-1 at PageID #: 551, 13:3–12.  Most telling is Officer Smith's testimony that when he took aim as Wild drove past him, he had to pivot left from "12 o'clock" to "9 and 11 o'clock" before firing his weapon into the driver's side rear window.  Smith dep. Tr., ECF No. 67-1 at PageID #: 564, 26:6–25.  Unlike the other Defendants, who were inhibited from seeing whether anyone was in imminent danger, Officer Smith could see that no other officers were in Wild's direct path as he attempted flee down the driveway.  Although Officer Smith knew that officers were located several hundred yards away at the end of the driveway near Route 7, there is no evidence that those officers were in *imminent* danger.  Smith dep. Tr., ECF No. 67-1 at PageID ##: 555–56, 17:25–18:11; Moran Aff. Ex. A-7, ECF No. 69-1 at PageID #: 747 ("Sgt. Dean told the officers . . . [t]here was a hunting cabin along the right side of the property driveway leading to [the] back of the property and was about ½ mile back.").

Notwithstanding the rapidly evolving situation, the record before the Court could permit a jury to find that Officer Smith lacked probable cause to believe that Wild posed an imminent threat to police or others before firing his weapon, that his use of deadly force was unreasonable, and, therefore, that his conduct violated Wild's Fourth Amendment rights.

Turning to the second qualified immunity prong, neither Plaintiff nor Officer Smith provided any controlling Sixth Circuit or Supreme Court to aid the Court.  *See* ECF No. 73; ECF No. 76.  Nevertheless, looking to *Burghardt*, *Cass*, and *Latits* (discussed above), Officer Smith's

31

(4:24CV285)

use of deadly force is distinguishable.[10]  In *Burghardt*, for instance, deadly force was reasonable because the suspect had demonstrated he was desperate to flee, having reversed into the police cruiser, and a police officer was standing in the only escape path.  *Burghardt*, 2022 WL 1773430, at *2.  In *Cass*, the suspect struck two officers and continued to accelerate, prompting one of the officers to fire a single shot out fear for the other officers at the scene.  *Cass*, 770 F.3d at 372.  Conversely, Officer Smith's saw that no one was in Wild's direct path, rendering *Burghardt* unhelpful to him.  Moreover, unlike in *Cass*, Wild did not hit anyone with his vehicle, although there was a close call.  This case is more like *Latits* because Officer Smith had time to realize that a dangerous situation had transformed into a safe one and that Wild did not pose an immediate threat to anyone at the scene.  Unlike Sgt. Bonar, who was unsure whether officers behind him were safe, Officer Smith *knew* there was no one in Wild's direct path.  Precedent makes clear that, under these circumstances, a reasonable officer in Officer Smith's position would have known that his conduct was prohibited.  Therefore, he is not entitled to qualified immunity and Officer Smith's motion for summary judgment is denied.

### F.  State-Law Claims

Plaintiff's state-law claims for wrongful death against Defendants Bonar, Garito, Pishotti, and Dean fail.  Because he cannot establish a Fourth Amendment violation, he likewise cannot

---

[10] The dissent in *Latits* makes a similar argument when questioning why one of the officers was granted qualified immunity.  Relying on *Smith v. Cupp*, 430 F.3d 766 (6th Cir. 2005) to argue that Latits' right was clearly established at the time of the violation, Judge Clay wrote: "According to the plaintiffs' evidence, [the officer] shot [Smith, who was fleeing in a stolen police cruiser,] *after* the [stolen] police cruiser was past [the officer] and there was no immediate danger to anyone in the vicinity. . . Although there was some danger to the public from Smith's driving off in a stolen police car, the danger presented by Smith was not so grave as to justify the use of deadly force."  *Latits*, 878 F.3d at 557 (Clay, J. concurring in part, dissenting in part) (emphasis added).  The jury, in this case, could ask this same question of Officer Smith's shooting.

(4:24CV285)

overcome those Defendants' claim of state-law immunity.  Under Ohio law, state employees are immune from civil liability for injuries caused by conduct taken within the scope of employment unless: (a) the conduct was manifestly outside the scope of their employment; (b) the conduct was done with malicious purpose, in bad faith, or in a wanton or reckless manner; or (c) civil liability is expressly imposed by Ohio law.  Ohio Rev. Code § 2744.03(A)(6).  When the question of state-law immunity turns on the same question of material fact as federal qualified immunity, courts may consider the state-law immunity question through the federal qualified immunity lens.  *Raimey v. City of Niles, Ohio*, 77 F.4th 441, 451 (6th Cir. 2023) (citing *Wright v. City of Euclid*, 962 F.3d 852, 878 (6th Cir. 2020)).

It is the plaintiff's burden to show the state employee is not entitled to immunity.  *Wiley v. City of Columbus, Ohio*, 36 F.4th 661, 671 (6th Cir. 2022) (citing *Cook v. City of Cincinnati*, 103 Ohio App. 3d 80, 90–91 (Ohio Ct. App. 1995)).  Plaintiff has not met that burden.  He does not assert that Defendants were acting outside the scope of their employment and, having failed to demonstrate that Defendants Bonar, Garito, Pishotti, and Dean's individual conduct was unreasonable, he cannot show that they acted with malicious purpose, in bad faith, or in a wanton or reckless manner.  *See Cass*, 770 F.3d at 377 (citing *Chappell v. City of Cleveland*, 585 F.3d 901, 916 n.3 (6th Cir. 2009)).  Therefore, Sgt Bonar, Deputy Garito, Officer Pishotti, and Sgt. Dean's motions for summary judgment on Plaintiff's state-law claims are granted.

Because, under the Fourth Amendment, Officer Smith's use of deadly force raises a genuine dispute, there is also a genuine issue of material fact as to whether he acted with malicious purpose, bad faith, or in a wanton or reckless manner.  Accordingly, Officer Smith's motion for summary judgment on Plaintiff's state-law claims is denied.

(4:24CV285)

## IV.     CONCLUSION

For the foregoing reasons, Daniel Lane's affidavit, and attachments thereto, included with Plaintiff's opposition to Defendants' Motions for Summary Judgment are stricken from the record.

The Motions for Summary Judgment of Defendants Jason Bonar (ECF No. 69), Dennis Garito (ECF No. 70), and Cody Dean (ECF No. 74) are granted.  Defendants Jarett Pishotti and Shane Smith's Motion for Summary Judgment (ECF No. 73) is granted as to Defendant Jarett Pishotti and denied as to Defendant Shane Smith.

Judgment shall be entered in favor of Defendants Jason Bonar, Dennis Garito, Cody Dean, and Jarett Pishotti, and the case against them is dismissed.  Defendant Shane Smith's Motion for Summary Judgment (ECF No. 73) is denied.  The case against Defendant Shane Smith shall proceed to trial.  A separate Trial Order shall issue.

IT IS SO ORDERED.


July 24, 2026
Date

*/s/ Benita Y. Pearson*
Benita Y. Pearson
United States District Judge

34